IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| MARVIN REEVES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 10-cv-1989 |
| v. | ) |
| | ) |
| JON BURGE, JOHN BYRNE, MICHAEL KILL, TOM | ) |
| PTAK, JOHN SMITH, THOMAS BYRON, WILLIAM | ) |
| FOLEY, LEE ALMANZA, WILLIAM KELLY, TONY | ) |
| MALSANKA, JOHN PALADINO, DANIEL MCINERNEY, | ) |
| JOHN EANNACE, MARK LUKANICH, UNNAMED AGENTS | ) |
| OF THE CHICAGO POLICE DEPARTMENT, THE CITY | ) |
| OF CHICAGO, and THE COUNTY OF COOK, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, MARVIN REEVES, by his attorneys, LOEVY & LOEVY, complains against the Defendants as follows:

### Introduction

1. Marvin Reeves spent 21 years in prison for a crime he did not commit.

2. Along with his co-defendant, Ronald Kitchen, Mr. Reeves was prosecuted and convicted for allegedly murdering two young women and their three children on July 26, 1988. More than two decades after the fact, Mr. Reeves and Mr. Kitchen were exonerated when the misconduct giving rise to their convictions, including police torture by Defendant Burge and his cohorts, finally came to light. Mr. Reeves was freed in July 2009.

3. Defendants' misconduct deprived Mr. Reeves of a fair trial, and violated his constitutional rights. Through this action, he seeks compensation for the 21 years of his life that were taken from him, and for the ongoing damage caused.

## Jurisdiction and Venue

4.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the case arises under federal law, namely the Constitution and 42 U.S.C. § 1983. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Mr. Reeves' state law claims.

5.     Venue is appropriate in this Court because a substantial portion of the events giving rise to Mr. Reeves' claims occurred in this District, and because at least one of the Defendants resides in this District.

## Parties

6.     Plaintiff Marvin Reeves is a citizen of Illinois.

7.     Defendant Jon Burge is a former Chicago Police Department Commander. In 1988, Defendant Burge was Commander of Area 3 Detective Division. Defendant Burge supervised all of the Defendant Officers.

8.     Defendant John Byrne is a former Chicago Police Department Sergeant. In 1988, Defendant Byrne was a Sergeant within Area 3 Violent Crimes. Defendant Byrne directly supervised Defendants Kill, Byron, Smith, Ptak, and other Defendant Officers.

9.     Defendants Michael Kill, John Smith, Thomas Byron, Tom Ptak, William Foley, Lee Almanza, William Kelly, Tony Maslanka, and John Paladino were Chicago Police Department Detectives. In 1988, each of these Defendants was a Detective within the Area 3 Detective Division.

2

10. Defendant Daniel McInerney was a Chicago Police Department Detective. In 1988, Defendant McInerney was a Detective with the Bomb and Arson Unit of the Chicago Police Department.

11. Collectively, Defendants Burge, Byrne, Kill, Byron, Smith, Ptak, Foley, Almanza, Kelly, Maslanka, Paladino, and McInerney, as well as other unnamed members of the Chicago Police Department acting pursuant to the City's policies and practices, are referred to in this Complaint as "Defendant Officers."

12. In 1988, Defendants Mark Lukanich and John Eannace were Assistant State's Attorneys ("ASAs") in the Office of the Cook County State's Attorney ("State's Attorney Defendants").

13. Defendant City of Chicago is a municipality and was, during the relevant period, employer of the Defendant Officers. Other members and/or employees of the City of Chicago its police department, including and/or in addition to the Defendant Officers, as well as some individuals who have not yet been identified, also caused and contributed to Mr. Reeves' injuries while acting pursuant to the City's policies and practices.

14. Defendant Cook County is a governmental entity and was, during the relevant time periods, the employer of Defendants Lukanich and Eannace.

3

## The Murders

15. In July 1988, Mr. Reeves was an auto mechanic living with his girlfriend on Chicago's South Side.

16. On the night of July 26-27, 1988, Debra Supelveda, Rosa Rodriguez, Ms. Supelveda's child, and Ms. Rodriguez's two children were murdered when somebody set fire to their home. All five died from fire-related causes.

17. The murders were well-publicized in the *Chicago Tribune* and other media outlets, which offered a telephone number for contacting the police about the case. As a result of the high-profile nature of the case, there was much pressure to solve the crime.

18. Members of the Chicago Police Department proceeded to investigate. Nearly immediately, several clues pointed toward the possible guilt of three people: Ms. Supelveda's husband, brother-in-law, and lover. Police officers questioned all three of these people and all three failed polygraph examinations.

## Willie Williams

19. As of August 5, 1988, the police had not arrested anyone for the crime. On that day, Willie Williams called Defendant Officers from prison. Mr. Williams was a convicted felon, serving time at Vandalia Correctional Center.

20. When Mr. Williams contacted the Defendant Officers, his first question was what they could do for him. Mr. Williams wanted to be moved to a work release program and to have his girlfriend and child moved to a new apartment.

4

21. Mr. Williams allegedly reported to the Defendant Officers that, in separate phone calls with Mr. Williams, Mr. Kitchen and Mr. Reeves, each told Mr. Williams that they had killed the victims in order to settle a debt that one of the women supposedly owed Mr. Kitchen and Mr. Reeves for drugs. None of what Mr. Williams allegedly told Defendant Officers was, in fact, true.

22. The Defendant Officers and ASAs Lukanich and/or Eannace asked Mr. Williams to call Mr. Kitchen and Mr. Reeves and to engage them in conversation about the murders while the Defendant Officers and ASAs Lukanich and/or Eannace listened to and recorded the calls.

23. Mr. Williams proceeded to make at least 36 calls to Mr. Kitchen and/or Mr. Reeves in August 1988. As far as can be discerned from the presently available record, neither Mr. Kitchen nor Mr. Reeves ever said a word on these calls implicating themselves in the murders. In fact, Mr. Reeves explicitly denied any involvement in the murders during these calls. However, the vast majority of these exculpatory call transcripts and recordings were destroyed by the CPD and/or the Defendant Officers.

24. Defendant Officers were affirmatively aware that Mr. Williams' story was unreliable because, among other things, all of the information that Mr. Williams provided Defendant Officers was publicly available from media reports, the dozens of calls Mr. Williams placed to Mr. Reeves and Mr. Kitchen yielded

5

no incriminating evidence, and Mr. Williams was pleading with Defendant Officers to help Mr. Williams be released from prison.

### Police Torture

25. Armed with Mr. Williams' uncorroborated assertions that Mr. Kitchen and Mr. Reeves had supposedly confessed to the murders, the Defendants endeavored to have Mr. Reeves and Mr. Kitchen implicate themselves in the crime via interrogation.

26. Specifically, Defendant Officers and ASA Lukanich brought Mr. Kitchen in for questioning on August 25, 1988. Defendants Burge, Kill, Byron, Smith, and other Defendant Officers proceeded to torture Mr. Kitchen with the intention of eliciting incriminating evidence. Defendant Lukanich participated in these torture sessions as one of Mr. Kitchen's interrogators.

27. The torture was brutal and sadistic, and lasted for hours. Among other things, Defendant Officers and Defendant Lukanich beat Kitchen with a blackjack, a telephone, and a telephone book; kicked and punched him repeatedly over several hours; and denied all requests from Mr. Kitchen for them to stop and for Kitchen to be provided an attorney. Eventually, these officers succeeded in torturing a false confession from Mr. Kitchen, who falsely implicated himself and Mr. Reeves in the murders.

28. In that false and coerced confession, Mr. Kitchen adopted the police version of the crime, namely, that he and Mr. Reeves murdered Ms. Supelveda and Ms. Rodriguez over a drug debt.

6

None of that was true. In truth, neither Mr. Reeves nor Mr. Kitchen had anything whatsoever to do with the murders.

29. Based on Mr. Kitchen's false and coerced confession and the unreliable information provided by Mr. Williams, CPD officers and agents arrested Mr. Reeves on August 26, 1988.

30. Defendant Officers Kill, Foley, Smith, Kelly, and Almanza, along with ASAs Lukanich and/or Eannace, oversaw the investigation and ordered the arrest of Mr. Reeves.

31. Some of the Defendants proceeded to subject Mr. Reeves to similarly torturous interrogation, including unjustified and unprovoked physical violence calculated to coerce Mr. Reeves to confess to a crime that neither he nor Mr. Kitchen had committed.

32. In order to build a false case against him, some of the Defendants proceeded to fabricate additional false evidence against Mr. Reeves in violation of his constitutional rights, and destroyed and/or otherwise withheld from Plaintiff and the State's Attorney, prosecutors, judges, and defense attorneys involved in Plaintiff's prosecution evidence which would have helped exonerate Plaintiff, all in violation of the Constitution.

33. In so doing, these Defendants, acting personally as well by and through conspiracy with others, coached and manipulated witnesses, and then withheld from the prosecutors the details of how they had done so.

7

34. These Defendants also utilized unduly suggestive procedures resulting in a faulty eyewitness identification which, when introduced at trial, deprived Plaintiff of due process.

35. The totality of Defendants' misconduct in Plaintiff's criminal case was so egregiously abusive that it shocks the conscience.

## The Malicious Prosecutions

36. On the basis of the "evidence" described above, Mr. Kitchen and Mr. Reeves were charged with five counts of first-degree murder; their trials were severed.

37. At Mr. Reeves' trial, Mr. Williams was the only witness presented by the State who claimed to know that Mr. Reeves committed the murders. Mr. Williams testified that Mr. Reeves and Mr. Kitchen had each confessed to him over the phone that they had committed the murders.

38. Mr. Williams repeatedly assured the jury that he received nothing in exchange for his testimony, which was false. Defendant Eannace repeated this (false) theme in opening and closing statements.

39. The State presented no physical evidence linking Mr. Reeves to the crime despite the collection of numerous fingerprints from the crime scene and additional substantial physical evidence collected at the scene.

40. Due to the torture of Mr. Kitchen, Mr. Reeves was unable to call Mr. Kitchen as a witness in his defense because Mr. Kitchen had falsely confessed that he and Mr. Reeves

8

committed the murders. Given the nature of the criminal case, the ability to have called Mr. Kitchen in his defense would have in all likelihood changed the outcome of Mr. Reeves' trial.

41. Due to the foregoing misconduct, Mr. Reeves was convicted and sentenced to life imprisonment without the possibility of parole.

## The Re-Trials

42. In 1995, Mr. Reeves' conviction was vacated on the grounds that Mr. Williams' testimony about Mr. Kitchen's statements violated Mr. Reeves' constitutional right to confront witnesses against him.

43. The State re-tried Mr. Reeves in 1997. Again, Mr. Williams provided the key testimony against Mr. Reeves, testifying that Mr. Reeves supposedly confessed in phone calls that he and Mr. Kitchen committed the murders as part of collecting a drug debt, and that Mr. Reeves and Mr. Kitchen were allegedly drug dealers who had sold drugs to Ms. Supelveda prior to her murder.

44. As before, Mr. Reeves was unable to call Mr. Kitchen as a witness because Mr. Kitchen had confessed to the crime. Mr. Reeves was once again convicted, as was Mr. Kitchen.

## The Exonerations

45. The convictions began to unravel in and around 2001. At that time, both men were pursuing post-conviction petitions, and the Cook County State's Attorney was prohibited from representing the State in response because the State's

9

Attorney's former law firm was also representing Defendant Burge in a widening inquiry into his repeated torture of suspects and witnesses. Accordingly, the Attorney General's Office was appointed to respond to Mr. Kitchen's petition.

46.     In 2003, the Attorney General's Office reviewed the State's Attorney's file for Mr. Kitchen's case and discovered documents detailing how the government helped Mr. Williams by moving him to a work-release program and paying nearly $800 for his family to move to a new apartment.

47.     Defendant Eannace personally played a substantial role in requesting and monitoring this assistance that the State had secretly provided to Mr. Williams. This substantial assistance had never before been revealed, and it directly contradicted Mr. Williams' and Defendant Eannace's statements at Mr. Reeves' trial to the effect that Mr. Williams had received no consideration for his testimony.

48.     Both Mr. Reeves and Mr. Kitchen persisted in their post-conviction efforts, now armed with the fact that the State violated their Brady rights by failing to disclose that the government provided substantial benefits to Mr. Williams.

49.     On July 7, 2009, the State informed the Cook County Circuit Court that it would not oppose Mr. Reeves' request for a new trial. Mr. Reeves was granted a new trial, and later that same day the State moved to dismiss all charges against Mr. Reeves, who was finally freed from custody.

10

## Chicago's Policy and Practice

50. Mr. Reeves was the victim of, and all of his injuries were proximately caused by, a policy and practice on the part of the City of Chicago.

51. Specifically, throughout the 1980s, a group of Chicago Police Officers in Area 2 under the command of Defendant Jon Burge engaged in systematic torture and abuse in attempting to extract confessions from suspects to "solve" crimes more expediently and to enhance their personal standing in the Department. This reality was known to the command personnel, who themselves participated in the torture.

52. When Burge was subsequently transferred to Area 3, the torture shifted to Area 3.

53. All told, there are up to ninety known victims of this pattern of police torture, though there may well be others. At least fourteen of these individuals ended up on Death Row.

54. The pattern of utilizing torture to coerce confessions was investigated and confirmed by official findings of internationally-recognized experts in torture and abuse, investigative agencies, administrative tribunals, and state and federal court judges and juries, as well as the Chicago Police Department's own Office of Professional Standards.

55. The following examples of torture occurred in Area 2 under Defendant Burge's watch and are corroborated by sworn testimony:

11

a. Andrew Wilson was beaten, tortured, burned, suffocated/bagged and electrocuted by Officer Burge and others while in police custody on February 10, 1982. Burge also put a gun in his mouth. Mr. Wilson gave sworn in-court testimony on November 12, 1982 describing this torture.

b. Alonzo Smith was beaten, tortured, coerced, and suffocated/bagged by Officer Byrne and another officer while in police custody on January 23, 1983. Mr. Smith gave sworn in-court testimony on August 3, 1983 describing this torture.

c. Jerry Mahaffey was beaten, tortured, coerced, and suffocated/bagged by Officer Byrne and others while in police custody on September 2, 1983. Mr. Mahaffey gave sworn in-court testimony on February 13, 1984 describing this torture.

d. Reginald Mahaffey was beaten, tortured, coerced, and suffocated/bagged by Officer Byrne and others while in police custody on September 2, 1983. Mr. Mahaffey gave sworn in-court testimony on February 10, 1984 describing this torture.

e. David Bates was beaten, tortured, coerced, and suffocated/bagged by Officer Byrne and others while in police custody on October 29, 1983. Mr. Bates gave sworn in-court testimony on June 13, 1985 describing this torture.

f. Gregory Banks was beaten, tortured, coerced, and suffocated/bagged by Officer Byrne and others while in police custody on October 29, 1983. Mr. Banks gave sworn in-court testimony on June 13, 1985 describing this torture.

g. Darrell Cannon was beaten, tortured, and electrocuted

12

by Officer Byrne and others while in police custody on November 23, 1983. Mr. Cannon gave sworn in-court testimony on March 27, 1984 describing this torture.

h. Leonard Hinton was beaten, tortured, coerced, electrocuted, and suffocated/bagged by Officers Burge and Byrne while in police custody on November 25, 1983. Mr. Hinton gave sworn in-court testimony on July 1, 1985 describing this torture.

i. Steven Bell was beaten, tortured, coerced, and suffocated/bagged by Officer Byrne and others while in police custody on July 21, 1986. Mr. Bell gave sworn in-court testimony on November 20, 1986 describing this torture.

j. Lavert Jones was beaten, tortured, coerced, and suffocated/bagged by Officer Byrne while in police custody on January 28, 1984. Mr. Jones gave sworn in-court testimony on March 5, 1987 describing this torture.

k. Derrick King was beaten, tortured, and coerced by Officer Burge and others while in police custody on February 23, 1980. Mr. King gave sworn in-court testimony on November 20, 1980 describing this torture.

l. Roy Wade Brown was beaten, tortured, coerced, and suffocated/bagged by Officer Burge and others while in police custody. Mr. Brown gave sworn in-court testimony on February 9, 1982 describing this torture.

m. Donald White was beaten, tortured, coerced, and suffocated/bagged by Officer Burge and others while in police custody on February 12, 1982. Mr. White gave sworn in-court

13

testimony describing this torture.

n.    Melvin Jones was beaten, tortured, electrocuted, coerced, and suffocated/bagged by Officer Burge and other Area 2 police officers while in police custody on February 5, 1982.  Mr. Jones gave sworn in-court testimony on August 5, 1982 describing this torture.

o.    Sylvester Green was beaten, tortured, and suffocated/bagged by Officers Burge, Paladino and others while in police custody.  Mr. Green gave sworn in-court testimony on March 4, 1983 and December 28, 1983 describing this torture.

p.    Shadeed Mu'min was beaten, tortured, coerced, and suffocated/bagged by Officers Burge and Paladino while in police custody on October 30, 1985.  Mr. Mu'min gave sworn in-court testimony describing this torture.

q.    Aaron Patterson was beaten, tortured, coerced, and suffocated/bagged by Officer Burge and others while in police custody on April 30, 1986.  Mr. Patterson gave sworn in-court testimony describing this torture on several occasions.

r.    Michael Johnson was beaten, tortured, shocked, and coerced by Officer Burge while in police custody.  Mr. Johnson gave sworn testimony on June 6, 1982 describing this torture.

s.    Frank Bounds was beaten, kicked, tortured, and coerced by Officers Kill and Foley while in police custody on October 6, 1987.  Mr. Bounds gave sworn in-court testimony describing this torture.

t.    Cortez Brown was beaten, tortured, and coerced by

14

Officers Paladino, Maslanka, and others while in police custody
in 1991. Mr. Brown gave sworn in-court testimony describing this
torture.

u. Demoni Clemon was beaten, tortured, shocked, threatened
with a pistol, and coerced by Officers Kill, Maslanka, and others
while in police custody in 1991.

v. Iamari and Jesse Clemon were beaten and coerced by
Officers Kill, Maslanka, and others while in police custody in
1991.

w. Sandy Curtis was beaten, kicked, and coerced by Officer
Paladino and others while in police custody in 1991.

x. Arnold Day was choked, threatened, and coerced by
Officer Foley and others while in police custody in 1992.

y. Javan Delony was slapped, beaten, and coerced by
Officer Foley while in police custody in 1991. Mr. Delony gave
sworn testimony describing this torture.

z. Jerry Gillespie was slapped, grabbed, choked, tortured,
and coerced by Officers Foley, Paladino, and others while in
police custody in 1993.

aa. Reginald Henderson was grabbed by the throat, beaten,
and coerced by Officer Foley and others while in police custody
in 1994. Mr. Henderson gave sworn in-court testimony describing
this torture.

bb. Anthony Jakes was beaten, tortured, threatened, and
coerced by Officer Kill and another officer while in police
custody on September 16, 1991. Mr. Jakes gave sworn in-court

15

testimony describing this torture.

cc.  Eric Johnson was beaten, kicked, and coerced by Officers Paladino, Maslanka, and others while in police custody in 1990.

dd.  Dwayne Macklin was beaten, threatened, and coerced by Officer Kill and another officer while in police custody in 1996.

ee.  Diyez Owens was beaten and coerced by Officers Kill and Maslanka while in police custody in 1991.

ff.  Michael Peterson was beaten, choked, kicked, and coerced by Officer Paladino and another officer while in police custody in 1991.

gg.  John Plummer was beaten with a flashlight, tortured, and coerced by Officer Kill and others while in police custody on August 18, 1991.  Mr. Plummer gave sworn in-court testimony describing this torture.

hh.  Frank Redd was beaten, kicked, threatened, and coerced by Officer Foley and others while in police custody on March 4, 1984.  Mr. Redd gave sworn in-court testimony describing this torture.

ii.  Anthony Robinson was beaten, tortured, and coerced by Officers Foley and Kill while in police custody on July 31, 1987. Mr. Robinson gave sworn in-court testimony describing this torture.

jj.  Michael Saunders was beaten, and tortured by Officers Foley and Paladino in police custody on March 11, 1995.  Mr. Saunders gave sworn in-court testimony describing this torture.

16

kk.   Sean Tyler was beaten, tortured, threatened, and coerced by Officer Foley and others while in police custody on April 2, 1994.   Mr. Tyler gave sworn testimony describing this torture.

ll.   Antoine Ward was beaten, tortured, threatened, and coerced by Officer Foley and others while in police custody on March 30, 1994.   Mr. Ward gave sworn testimony describing this torture.

mm.   Demond Weston was beaten, threatened, and coerced by Officers Kill, Maslanka, and others while in police custody on June 9, 1990.   Mr. Weston gave sworn testimony describing his beating.

nn.   Marcus Wiggins was beaten, shocked, tortured, threatened, and coerced by Officers Kill, Maslanka, Paladino, and others while in police custody in 1991.

oo.   Manuel Bobe was beaten, threatened, tortured, and coerced by Officer Kill and others while in police custody on November 8, 1986.   Mr. Bobe gave sworn testimony describing his torture.

pp.   Jason Gray was beaten, threatened, and coerced by Officer Kill while in police custody on November 9, 1986.

qq.   Michael Taylor was beaten, threatened, kicked in the groin, and coerced by Officer Foley and others while in police custody in 1994.   Mr. Taylor gave sworn testimony describing his torture.

17

rr.   Leroy Orange was beaten, threatened, shocked, tortured, bagged/suffocated, and coerced by Officer Burge and others while in police custody on January 12, 1984.  Mr. Orange gave sworn testimony describing this torture.

56.   In addition to the above-listed torture victims, the dozens of other individuals were also tortured by police officers under the command of Defendant John Burge.

57.   Defendants Byrne and Burge were involved in many of these cases, as were other police officers from Area 2 and Area 3.  According to Chicago's OPS statistics, Burge was named as an accused in 51 percent of the cases where the accused officers could be identified.

58.   With only one exception, all of the foregoing torture victims (98 percent) were African-American men.

59.   All of the accused police officers were white.

60.   What is striking about the accusations is the repetitiveness in terms of the details regarding the modus operandi of the torturers.

61.   In many of the cases which resulted in coerced confessions, including Mr. Kitchen's, there was no other physical evidence (such as fingerprints or a weapon) linking the confessor to the crime.

62.   The Illinois Supreme and Appellate Courts and the United States District Court have reversed convictions and/or ordered new hearings and trials on the basis of evidence of confessions coerced by torture in, for instance, the following

cases: People v. Wilson, 116 Ill. 2d 29 (1987); People v. Banks, 192 Ill. App. 3d 986 (1989); People v. Cannon, 293 Ill. App. 3d 694 (1997); People v. Patterson, 192 Ill. 2d 93 (2000); People v. Bates, 267 Ill. App. 3d 503 (1994); People v. King, 192 Ill. 2d 189 (2000); United States ex. rel. Maxwell v. Gilmore, 1999 WL 130331 (N.D. Ill. 1999).

63. Because convictions were improperly secured by means of police torture under Commander Burge, four of the individuals listed in the foregoing paragraphs (Plaintiff, Aaron Patterson, Madison Hobley, and Leroy Orange) were all pardoned by then-Governor Ryan on the grounds of innocence. Still more victims of Area 2 police torture had their death sentences commuted by Governor Ryan in an attempt to reverse the injustice.

64. Former Police Superintendent Richard Brzeczek, who was Superintendent when many of the torture allegations arose, recently told the *Chicago Tribune* that there is now "no doubt in [his] mind that Burge and his men tortured some suspects."

## Chicago's "Blind Eye"

65. The coercive interrogations described in the preceding paragraphs were allowed to take place because the City declined to implement any mechanism for oversight or punishment.

66. In particular, the Department's system for disciplining police officers accused of using violence is basically nonexistent. During the time period at issue, the agency charged with investigating these allegations, OPS, rejected approximately 95 percent of all citizen complaints of violence, and the very

19

few which were "sustained" were usually overturned on review such that no discipline was ever imposed. The pattern described in this Paragraph continues unchanged to this day.

67. In 1987, then-Chief Administrator of OPS David Fogel wrote a memo admitting that OPS was a farce.

68. Specifically, the Fogel Memo admits that "the troops love OPS. . . [It] actually operates to immunize police from internal discipline. . . and has institutionalized lying." Fogel's memo explained that a substantial proportion of OPS's investigators were thoroughly incompetent, part of a "politically corrupt heritage of pre-[Mayor Harold] Washington days."

69. Fogel's memo concludes in part that: "OPS gives the appearance of formal justice, but actually helps to institutionalize subterfuge and injustice."

70. With respect to the allegations of police torture in Area 2, OPS initially found that each and every one of the allegations was groundless. Thus, at the time the allegations were first made, no Chicago police officer was deemed culpable, much less disciplined, for any of these instances of coercive/torturous interrogations.

71. In addition to failing to discipline the offending officers internally, the Department also referred none of these allegations of police torture to the State's Attorney's Office for possible prosecution of the officers. This institutional unwillingness to refer accusations of police brutality for prosecution was true throughout the relevant time period, and it

20

continues through to the present.

72. In this way, Chicago police officers who beat or tortured criminal suspects during interrogation had every reason to know that they enjoyed de facto immunity from criminal prosecution and/or Departmental discipline, thereby encouraging the very type of abuse at issue in this case.

### Suppression of Exculpatory Information Regarding These Torture Allegations

73. In September 1990, an OPS investigator named Goldston concluded a study of more than fifty allegations of police torture in Area 2 through the mid-1980s; this investigation was based on review of cases one by one, and the data was compiled into a 160-page statistical analysis.

74. The resulting Goldston Report dated September 28, 1990 -- which was after Mr. Reeves was convicted but before his appeal was resolved -- concluded that a "preponderance" of evidence dictated the conclusion that "systematic" and "methodical" abuse occurred over a ten year period, abuse which was "not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture."

75. The Report also concluded that certain unnamed "[p]articular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end."

76. Instead of disclosing the new exculpatory evidence to Mr. Reeves' defense, the City of Chicago, acting through policymakers, suppressed the Goldston Report.

21

### Still More Suppression
### of Exculpatory Materials

77.    Fewer than half of the 50 examples of torture
cited in the Goldston Report had been investigated
contemporaneously by OPS.  Overall, only one of the 50 cases had
resulted in a finding adverse to an accused police officer.
Thus, with only one exception, the Department either conducted no
investigation or cleared the accused in every one of these 50
torture cases.

78.    In 1992, with public attention focused on
suppressed accusations of police torture after the Goldston
Report came to light, as well as the initiation of proceedings to
terminate Burge that same year, the CPD Superintendent at the
time publicly promised an investigation into allegations of
police torture.

79.    To that end, nine of the allegations of torture
were re-opened by OPS.

80.    In most of these re-opened cases, the subsequent
re-investigation reversed the original exonerations and
"sustained" the findings of wrongdoing on the part of the accused
officers.

81.    In spite of these new conclusions that certain
police officers were guilty of torturing suspects during
interrogations, the Department took no disciplinary action
against any officer, many of whom were still on the force, except
Burge.

22

82. Instead, approximately five years after the re-investigations found the torture allegations credible and recommended discipline in some cases, the City made a secret decision to suppress all of these new O.P.S. findings.

83. Specifically, in August 1998, after Mr. Reeves' second trial had been completed, a City official wrote a confidential memo instructing OPS to close all of the cases and to re-classify all of these newly "sustained" findings as "non-sustained," thereby clearing all of the officers. This City official subsequently claimed he had never really read the files, and the Police Superintendent at the time who made the decision (Terry Hilliard) claimed he never even saw them.

84. From 1992 through 1999 the Department and policymaking officials with policymaking authority over these matters kept secret the new "sustained" findings and the related evidence supporting the victims. This secret might have remained buried forever had it not been exposed involuntarily per court order in the course of a civil case against Chicago in mid-1999.

85. Had the information been provided to Mr. Reeves rather than suppressed, his post-conviction proceedings would have been resolved favorably to Mr. Reeves.

86. Other than Defendant Burge, Chicago has never disciplined any police officer for any of the allegations of police torture, including those officers who were subsequently adjudicated culpable after the re-investigations. Nor were any of the involved officers ever referred to the State's Attorneys'

23

Office for prosecution, and some remain on the force to this day unpunished in any manner.

## Mr. Reeves' Damages

87. At the time that Mr. Reeves was wrongfully convicted of five murders, he was 29 years old. He had children, and his girlfriend was pregnant with another child.

88. In serving the next 21 years behind bars, Mr. Reeves was wrongfully deprived of much of his adult life to date. Mr. Reeves was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live ones life as an autonomous human being.

89. As a result of his wrongful incarceration, Mr. Reeves must now attempt to rebuild his life outside of prison, all without the benefit of the life experience that ordinarily equips adults for that task.

## Count I -- 42 U.S.C. 1983

### Constitutional Rights (Defendant Officers)

90. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

91. By all of the conduct described above, one or more Defendant Officer deprived Mr. Reeves of his constitutional rights, including that of his right to a fair trial.

24

92. One or more Defendant Officers deliberately withheld exculpatory evidence, as well as fabricated false reports, false statements, and other evidence, thereby misleading and misdirecting the criminal prosecution of Mr. Reeves.

93. The misconduct described in this Complaint directly resulted in the unjust criminal conviction of Mr. Reeves, thereby denying him his constitutional right to a fair trial, and a fair appeal thereof, in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, among others.

94. As a result of this violation of his constitutional rights, Mr. Reeves suffered injuries, including, but not limited to, emotional distress, as more fully alleged above.

95. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Reeves' constitutional rights such that Defendants' actions shock the conscience.

96. The misconduct undertaken in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department to pursue wrongful convictions through profoundly flawed investigations, including the use of torture. In this way, the City of Chicago violated Mr. Reeves' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations. These widespread policies and practices were undertaken by agents of

25

the Chicago Police Department, some of whom may not be named in this action, acting pursuant to those policies and practices.

97. These widespread practices, so well-settled as to constitute de facto policy in the Chicago Police Department, were able to exist and thrive because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

98. The widespread practices described in the preceding paragraphs were allowed to flourish because the City declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment. Indeed, the Department's system for investigating and disciplining police officers accused of this type of misconduct was, for all practical purposes, nonexistent. As a result, officers are led to believe that they can act with impunity, thereby encouraging the very type of abuses that befell Mr. Reeves.

## Count II -- 42 U.S.C. 1983

### Constitutional Rights (State's Attorney Defendants)

99. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

100. By all of the conduct described in this Complaint, one or more of the State's Attorney Defendants deprived Mr. Reeves of his constitutional rights, including that of his right to a fair trial.

101. Prior to the existence of probable cause to believe that Mr. Reeves had committed any crime, one or more of

26

these Defendants participated with the Defendant Officers in the physically and psychologically coercive interrogations of Mr. Reeves and Mr. Kitchen, in an attempt to coerce false confessions from them. In this manner, one or more of these Defendants was acting in a capacity akin to an investigating police officer.

102. Pleading in the alternative, one or more of the Defendants participated with the Defendant Officers in the manipulation of Mr. Williams into providing false testimony against Mr. Reeves and Mr. Kitchen.

103. The misconduct described in this Complaint directly resulted in the unjust criminal conviction of Mr. Reeves, thereby denying him his constitutional right to a fair trial, and a fair appeal thereof, in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, among others.

104. As a result of this violation of his constitutional rights, Mr. Reeves suffered injuries, including, but not limited to, emotional distress, as more fully alleged above.

105. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Reeves' constitutional rights such that Defendants' actions shock the conscience.

27

## Count III -- 42 U.S.C. 1983

### Failure to Intervene

106. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

107. In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct.

108. As a result of these Defendants' failure to intervene to prevent the violation of Mr. Reeves' constitutional rights, Mr. Reeves suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

109. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Reeves' constitutional rights.

110. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

## Count IV -- 42 U.S.C. 1983

### Conspiracy (Defendant Officers)

111. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

112. One or more of the Defendant Officers reached an agreement amongst themselves to falsely accuse Mr. Reeves and to deprive him of his constitutional rights, as described above.

28

113. Independently, before and after Mr. Reeves' convictions, one or more of these Defendants further conspired to deprive Mr. Reeves of exculpatory material to which he was lawfully entitled and that would have led to his more timely exoneration of the false charges described in this Complaint.

114. In this manner, one or more of these Defendants, acting in concert with other unknown co-conspirators, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

115. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

116. As a direct and proximate result of the illicit prior agreement referenced above, Mr. Reeves' rights were violated. He suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

117. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiffs rights.

118. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for the City of Chicago with final policymaking authority.

29

## Count V -- 42 U.S.C. 1983

### Equal Protection

119. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

120. As described more fully above, Defendant Officers denied Plaintiff equal protection of the law.

121. Specifically, these Defendants actively participated in or personally caused misconduct in terms of torturing minority criminal suspects in a manner calculated to coerce confessions, suppressed or withheld evidence that minority criminal suspects were routinely tortured to obtain coerced confessions, and/or thwarted the investigation of said torture. Said misconduct was motivated by racial animus and constituted purposeful discrimination; it also affected minorities in a grossly disproportionate manner vis-a-vis similarly-situated Caucasian individuals.

122. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress.

123. The misconduct by the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department in the manner described more fully above.

124. Independently, the misconduct described in this Count is also attributable to Defendants Burge and Byrne in their supervisory capacities as described more fully above.

## Count VI -- State Law Claim

### Malicious Prosecution (Defendant Officers)

125. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

126. One or more of the Defendant Officers caused Mr. Reeves to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Mr. Reeves' favor in a manner indicative of innocence.

127. These Defendants accused Mr. Reeves as a perpetrator of criminal activity knowing those accusations to be without probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

128. These Defendants' statements regarding Mr. Reeves' alleged culpability were made with knowledge that such statements were false and perjured. In so doing, these Defendants fabricated evidence and withheld exculpatory information.

129. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiffs rights.

130. As a result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

31

## Count VII -- State Law Claim

### Civil Conspiracy (Defendant Officers)

131. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

132. As described more fully in the preceding paragraphs, one or more of the Defendants Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

133. In furtherance of the conspiracy, these Defendants committed overt acts and were otherwise willful participants in joint activity.

134. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Mr. Reeves' rights.

135. As a proximate result of this conspiracy, Plaintiff suffered injuries, including, but not limited to emotional distress, as is more fully alleged above.

## Count VIII -- State Law Claim

### Intentional Infliction of Emotional Distress

136. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

137. The acts and conduct of one or more of the Defendants as set forth above were extreme and outrageous. Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause severe emotional

32

distress to Mr. Reeves, as is more fully alleged above.

138. Said actions and conduct did directly and proximately cause severe emotional distress to Mr. Reeves, and thereby constituted intentional infliction of emotional distress.

139. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to the rights of others.

140. As a proximate result of Defendants' wrongful acts, Mr. Reeves suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## Count IX -- State Law Claim

### Respondeat Superior (City of Chicago)

141. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

142. In committing the acts alleged in the preceding paragraphs, Defendant Officers were members or agents of the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

143. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## Count X -- State Law Claim

### Respondeat Superior (Cook County)

144. Each of the paragraphs of the Complaint is incorporated as if restated fully herein.

145. In committing the acts alleged in the preceding paragraphs, Defendants Lukanich and Eannace were members of or

33

otherwise were agents of Cook County, acting at all relevant
times with the scope of their employment and under color of law.

146. Defendant Cook County is liable as principal for
all torts committed by its agents.

## Count XI -- State Law Claim

## Indemnification (City of Chicago)

147. Each of the paragraphs of the Complaint is
incorporated as if restated fully herein.

148. Illinois law provides that public entities are
directed to pay any tort judgment for compensatory damages for
which employees are liable within the scope of their employment
activities.

149. Defendant Officers are or were employees of the
Chicago Police Department who acted within the scope of their
employment in committing the misconduct described herein.

## Count XII -- State Law Claim

## Indemnification (Cook County)

150. Each of the paragraphs of the Complaint is
incorporated as if restated fully herein.

151. Illinois law provides that public entities are
directed to pay any tort judgment for compensatory damages for
which employees are liable within the scope of their employment
activities.

152. Defendants Lukanich and Eannace are or were
employees of Cook County who acted within the scope of their
employment in committing the misconduct described herein.

34

WHEREFORE, Plaintiff Marvin Reeves respectfully requests that this Court enter judgment in his favor and against Defendants Jon Burge, John Byrne, Michael Kill, John Smith, Thomas Byron, Tom Ptak, William Foley, Lee Almanza, William Kelly, Tony Malsanka, John Paladino, Daniel McInerney, John Eannace, Mark Lukanich, the City of Chicago, and Cook County, awarding compensatory damages, costs, and attorneys' fees, as well as any other relief available under the law.

**JURY DEMAND**

Plaintiff, MARVIN REEVES, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Mike Kanovitz
Daniel Twetten
Elizabeth Wang
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

35